THOMAS, Judge.

Facts and Procedural History

On December 13, 2005, Grand Harbour Development, LLC (“GHD”), entered into a sales contract to purchase approximately 13 acres of waterfront property in Orange Beach (“the property”) from Mitchell G. Lattof, Jr., individually and as trustee under the Will of Frankie T. Lattof, deceased, and Walter Trent Marina, Inc. (hereinafter referred to collectively as “Lattof’). The record indicates that GHD intended to construct a 462-unit condominium development (“the development”) on the property. In addition to the purchase price of $25,000,000, the contract included a number of terms, including covenants and easements. Paragraph 14 of the contract, the construction of which serves as the underlying dispute in this action, reads as follows:
“14. Sellers’Purchase of Units.
“(A) Sellers shall receive, in the aggregate, a credit of $1,500,000.00 against pre[-]construction opening list prices on up to three (3) condominium units with Sellers being given the absolute first choice for one of such units and being *1233 given the 20th and the 35th choices for the others of such units. Sellers shall notify Buyer of Sellers’ first choice within fifteen (15) days of being provided with floor plans, site plan and tentative pricing, and Sellers shall, promptly upon Buyer’s request, execute Buyer’s standard pre-construction purchase agreement and post a cash pre-construction earnest money deposit equal to whatever percentage of the purchase price is required of all other pre[-]construction purchasers of units in the development. Sellers acknowledge that the cash deposit may be used by Buyer for construction purposes in accordance with the Alabama Condominium Act, as amended. At the time that Sellers designate their first choice, Sellers shall also identify to Buyer the unit Sellers hope to purchase with their 20th choice and 35th choice. Sellers acknowledge that floor plans, site plan and pricing provided to Sellers are not necessarily final, and, until the pre-construction purchase agreement is executed by both parties (or thereafter as may be permitted by such pre[-]construction purchase agreement), Buyer may make such change as Buyer deems best fit in Buyer’s sole and absolute discretion. For example, if tentative pricing for a unit chosen by Sellers is $1,000,000.00, but Buyer later increases all prices by 10% for substantially all of the units or all of the units of the type chosen by Sellers, then the price for the unit chosen by Sellers shall also be increased commensurately. Sellers shall not be entitled to purchase any boat slips with these units. In lieu of providing all or part of this credit to Sellers, as a buy-out of all or some of Sellers’ under this paragraph 14(A), Buyer may pay to Sellers in cash at any ... time prior to the execution of pre-construction purchase agreements using the entirety of the credit, the amount of the then remaining credit plus the sum of $25,000.00.
“(B) In addition to the rights of Sellers under subparagraph 14(A) above, Sellers shall have thirty (30) days following Buyer’s delivery to Sellers of its pre-construction pricing and building grid to elect to purchase up to twenty-five (25) units on a ‘first-come, first-served’ basis; Sellers’ election and selection of then available units must be set forth in writing faxed, prior to the expiration of such thirty (30) day period, to all of the following: (i) ... to Randy Davis/Frank Malone, (ii) ... to Skip Davis, (iii) ... to Richard Davis, and (iv) ... to Jim Defoe. Upon Sellers’ giving notice of their election and selection as aforesaid, this Agreement shall be deemed amended to require Sellers, promptly upon Buyer’s request, to execute Buyer’s standard pre-construction purchase agreement and to post a cash pre[-]construction deposit. Buyer shall have no obligation to ‘hold’ any units for Sellers during this thirty (30) day period, and if any unit desired to be purchased by Sellers pursuant to this subparagraph 14(B) has been committed to another buyer prior to Sellers’ fixing their selections as aforesaid, Sellers shall not be entitled to purchase such unit. Buyer is not required to offer these units with boat slips.”
The parties closed on the sale of the property two days after executing the contract; GHD began clearing the property and constructing marine improvements on the waterfront. GHD also submitted its development plans to the City of Orange Beach (“the City”) and received zoning and site-plan approval of those plans. However, according to GHD, “[i]n the months following closing, the real estate market at Orange Beach suffered a dramatic decline.” Due to the decline in the real- *1234 estate market, GHD had not begun construction on the development by the time of this appeal.
Lattof filed a complaint in the Baldwin Circuit Court (“the trial court”) on October 28, 2011, alleging that GHD had not performed in accordance with paragraph 14(A) of the contract and asking the trial court to interpret the provisions of the contract and to determine that a reasonable time for performance had elapsed. On January 10, 2012, GHD filed an answer and a counterclaim in which it raised several defenses and asked the trial court to declare the contract “illegal and void”; Lattof filed an answer to the counterclaim on February 1, 2012.
Lattof filed a motion for a summary judgment on April 20, 2012, arguing that, because the contract did not include a specific time for GHD to perform in accordance with paragraph 14(A) of the contract, as a matter of law, GHD had been required to perform within a reasonable time and that that time had elapsed. On June 6, 2012, GHD filed a motion for a summary judgment on its counterclaims and an opposition to Lattofs motion for a summary judgment. In its motion for a summary judgment, GHD contended that the contract violated § 11-52-30 et seq., Ala.Code 1975, and the City’s subdivision regulations and was, therefore, void. Alternatively, GHD requested that the trial court find that paragraph 14(A) was void for vagueness or that that section of the contract contained a condition precedent that had not yet occurred.
The trial court entered two judgments on June 22, 2012 — one granting Lattofs motion for a summary judgment and the other denying GHD’s motion for a summary judgment. GHD filed a motion to alter, amend, or vacate both judgments on July 18, 2012; the trial court denied GHD’s postjudgment motion on July 19, 2012. On July 25, 2012, GHD filed an appeal with our supreme court. However, Lattof filed in the trial court a motion for further relief, seeking entry of judgment and/or requesting that the trial court require the posting of a supersedeas bond on August 20, 2012; GHD filed a motion in opposition on August 28, 2012. The appeal was transferred to this court pursuant to § 12-2-7(6), Ala.Code 1975. On November 1, 2012, this court reinvested the trial court with jurisdiction to “consider and enter, if it ch[ose], a final judgment that addresses all claims and forms of relief requested”; Lattof filed a renewed motion for further relief, seeking entry of judgment and/or requesting that the trial court require the posting of a supersedeas bond.
The trial court entered a judgment on November 1, 2012, finding, among other things, that GHD had breached the contract, that a reasonable time for performance in accordance with paragraph 14(A) had elapsed, and that the sale of the property did not violate state statutes or the City’s regulations regarding the sale of subdivided property. The judgment granted Lattofs motion for a summary judgment and denied GHD’s motion for a summary judgment on its counterclaims. Subsequently, on November 16, 2012, this court again reinvested the trial court with jurisdiction to enter an amended final judgment. Lattof filed in the trial court a motion styled as a request for modification of judgment on November 19, 2012, which requested that the trial court set out its calculations of prejudgment interest and include that amount in the final judgment. The trial court entered an amended final judgment on November 26, 2012; GHD filed a postjudgment motion on that same day. This court then issued an order stating:
“The trial court having rendered and entered a final Judgment in accordance *1235 with this Court’s remands of November 1 and 16, 2012, and a Rule 59, Ala R. Civ. P., motion having been filed, this appeal is held in abeyance pursuant to Rule 4(a)(5), Ala. R.App. P.”
GHD filed a motion to stay enforcement of the judgment and a supersedeas bond in the trial court on November 28, 2012. The trial court denied GHD’s postjudgment motion but granted its motion to stay, on January 17, 2013, at which time GHD’s appeal to this court became effective. See Rule 4(a)(5), Ala. R.App. P. (“[A] notice of appeal shall become effective upon the date of disposition of the last of all [post-judgment] motions.”).
GHD asserts the following issues in its brief on appeal: whether the contract violates subdivision-control statutes and regulations, thereby rendering it void and unenforceable; whether the contract is vague and indefinite; whether there are conditions precedent to GHD’s obligation to perform in accordance with paragraph 14(A) that have not yet occurred; and whether the award of money damages was proper.

Standard of Review

“We review a trial court’s summary judgment under a de novo standard of review. Specifically,
“ ‘[a] summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala. 1994).”
Walker v. North American Sav. Bank, [Ms. 2110055, March 8, 2013] - So.3d -, -(Ala.Civ.App.2013).

Analysis

I.
We first address GHD’s argument that the contract violated § 11-52-30 et seq., Ala.Code 1975, and the City’s subdivision regulations. Specifically, GHD maintains that the sale of the property, which was a portion of a larger parcel, constituted a subdivision and that a contract to convey real estate situated within a subdivision is illegal unless the real estate subject to the contract has been subdivided in compliance with the subdivision-control statutes. Section 11 — 24—1(a)(4), Ala.Code 1975, defines “subdivision” as
“[t]he development and division of a lot, tract, or parcel of land into two or more lots, plats, sites, or otherwise for the purpose of establishing or creating a subdivision through the sale, lease, or building development. Development includes, but is not limited to, the design work of lot layout, the construction of drainage structures, the construction of buildings or public use areas, the planning and construction of public streets *1236 and public roads, and the placement of public utilities. A subdivision does not include the construction or development of roads or buildings on private property to be used for agricultural purposes.”
Section ll-52-33(a), Ala.Code 1975, further provides:
“Where the regulation of a subdivision development is the responsibility of the municipal planning commission, if the owner or agent of the owner of any land located within a subdivision, transfers or sells or agrees to sell or negotiates to sell any land by reference to or exhibition of or by other use of a plat of a subdivision before the plat has been approved by the municipal planning commission and recorded or filed in the office of the appropriate county probate office, the owner or agent shall forfeit and pay a penalty of one hundred dollars ($100) for each lot or parcel so transferred or sold or agreed or negotiated to be sold, and the description of the lot or parcel by metes and bounds in the instrument of transfer or other document used in the process of selling or transferring shall not exempt the transaction from the penalties or from the remedies provided in this section.”
The City has enacted similar provisions pursuant to the authority granted by § 11-52-30 et seq. Section 1.04 of the City’s subdivision regulations defines a subdivision as
“[a]ny land, vacant or improved, which is divided or proposed to be divided into 2 or more lots, parcels, sites, plots, tracts or interests for the purpose of offer, sale, or lease whether immediate or future, either on the installment plan or upon any and all other plans, terms, and conditions. Subdivision includes the division or development of residentially and non-residentially zoned land, whether by deed, metes and bounds description, devise, intestacy, lease, map or plat, or other recorded instrument.”
Section 5.02 of the City’s subdivision regulations provides:
“Whomever transfers or sells, or agrees to sell, or negotiates to sell any land by reference to, or exhibition of, or by other use of a plat of a subdivision before such plat has received final approval of the Orange Beach Planning Commission and recorded/filed in the Office of the Probate Judge, Baldwin County, Alabama, shall forfeit and pay a penalty to the City of $500 for each lot or parcel so transferred or sold or agreed or negotiated to be sold. The City may enjoin such transfer or sale or agreement by action for injunction brought in any court of equity jurisdiction, and/or may recover the same penalty by civil action in any court of competent jurisdiction.”
GHD maintains that the contract violated § ll-52-33(a), Ala.Code 1975, and § 5.02 of the City’s subdivision regulations in two ways. First, GHD contends, because the sale of the 13 acres resulted in a subdivision of the larger parcel, and because an approved plat of the subdivision was not recorded, the sale of the property violated the statute and regulations quoted above, thereby rendering the contract void. Second, GHD argues that paragraph 14(A) of the contract violated the statute and regulations quoted above because it contemplated the sale of condominium units, a further subdivision of the property. It is true that “[i]t has long been the law in Alabama that when a contract is made in violation of a statute, that contract is generally void and unenforceable.” Kilgore Dev., Inc. v. Woodland Place, LLC, 47 So.3d 267, 270 (Ala. Civ.App.2009). The resolution of this issue turns on the meaning of the statute and regulations quoted above; however, there is little authority to guide our interpreta *1237 tion. We must therefore turn to the rules of statutory construction.
“ ‘ “The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute.” IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 844, 846 (Ala.1992). “ ‘However, when possible, the intent of the legislature should be gathered from the language of the statute itself.’ ” Perry v. City of Birmingham, 906 So.2d 174, 176 (Ala.2005) (quoting Beavers v. Walker County, 645 So.2d 1365, 1376 (Ala.1994)); Ex parte Lamar Advertising Co., 849 So.2d 928, 930 (Ala.2002). Therefore, in “determining the meaning of a statute, we must begin by analyzing the language of the statute.” Holcomb v. Carraway, 945 So.2d 1009, 1018 (Ala.2006).
“ ‘ “Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.”
“ ‘IMED Corp., 602 So.2d at 346; see also Wynn v. Kovar, 963 So.2d 84 (Ala.Civ.App.2007). Stated differently, when “the language of a statute is plain and unambiguous, ... courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning — they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature.” Ex parte T.B., 698 So.2d 127, 130 (Ala.1997); see also Perry, 906 So.2d at 176; Ex parte Lamar Advertising Co., 849 So.2d at 930; Beavers, 645 So.2d at 1376-77; Ex parte United Serv. Stations, Inc., 628 So.2d 501 (Ala.1993); and IMED Corp., 602 So.2d at 344.’
“Alabama Dep’t of Envtl. Mgmt. v. Legal Envtl. Assistance Found., Inc., 973 So.2d 369, 376 (Ala.Civ.App.2007).”
Boone v. Birmingham Bd. of Educ., 45 So.3d 757, 761-62 (Ala.Civ.App.2008).
GHD cites Kilgore in support of its argument. The parties in Kilgore executed a contract for the sale of lots in a subdivision before the recordation of the subdivision plat. Id. at 268. This court, citing § ll-52-30(b) and § 11-52-33, held that the contract was void and that the buyer was entitled to rescind the contract. Id. at 272. In concluding that the contract was void, this court noted that the contract provided that the buyer would purchase 44 lots of the proposed subdivision that were “ ‘more particularly described on the unrecorded map or plat’ of the subdivision” and that the unrecorded plat was attached to the contract as an exhibit. Id.
Similarly, our supreme court held in Limestone Creek Developers, LLC v. Trapp, 107 So.3d 189, 193 (Ala.2012), that a contract to purchase lots within a subdivision was void because it violated the county subdivision regulation that required approval of the subdivision plat “ ‘[p]rior to the actual sale, offering for sale, [or] transfer or lease of any lots.’ ” The buyer was involved in the initial development of the subdivision and provided input as to the layout of the subdivision, which was divided into 51 lots per the buyer’s request. Id. at 190. In the contract at issue in Limestone Creek, the buyer agreed to “purchase the 51 lots in Heritage Landings from LCD for $30,000 each.” Id. at 190— 91. Our supreme court concluded that that action violated the county subdivision regulations.
GHD asserts that the contract in this case was void both on the basis of the *1238 sale of the property from Lattof to GHD and on the basis of the anticipated conveyance of condominiums described in paragraph 14(A). We disagree. In both Kil-gore and Limestone Creek, the contracts that were determined to be void specified that the sellers were selling lots within a subdivision and referenced unrecorded plats that had not yet received approval from the proper authorities. However, the contract in the present case conveyed the property from Lattof to GHD in one parcel. A review of the contract does not yield any reference to a plat or lots within a subdivision.[1] Additionally, although it is true that we have previously held that condominiums are subdivisions and are subject to relevant subdivision statutes and regulations, see Dyess v. Bay John Developers II, LLC 13 So.3d 390 (Ala.Civ. App.2007), we note that the language of paragraph 14(A) did not reference a subdivision plat or map, a lot, or even a specific condominium unit. Paragraph 14(A), instead, merely established that Lattof would have the option to acquire, and established the procedure for the acquisition of, the condominium units GHD would build in the future. We, therefore, cannot conclude that either the conveyance executed by the contract or the future conveyances contemplated by the contract violated § 11-52-33 or the City’s subdivision regulations.
II.
We now address GHD’s second and third issues: that the contract, and paragraph 14(A) specifically, was so vague and indefinite that paragraph 14(A) is effectively only an agreement to agree and that there are conditions precedent to GHD’s obligation to perform in accordance with paragraph 14(A) that have not yet occurred.[2]
“In interpreting a contract, a trial court must heed the following principles:
“ ‘If a contract is unambiguous on its face, there is no room for construction and it must be enforced as written. See Thompson Tractor Co. v. Fair Contracting Co., 757 So.2d 396, 398 (Ala.2000); Ex parte Hagan, 721 So.2d 167, 173 (Ala.1998). A court may not twist the plain meaning of the terms in the contract to create an ambiguity under the guise of interpretation. See [Universal Underwriters Life Ins. Co. v.] Dutton, 736 So.2d [564,] 570 [ (Ala.1999) ]. The primary source for deciding whether a contract is clear is the text of the document itself. “It is well established in Alabama that when an instrument is unambiguous its construction and legal effect will be based upon what is found within its four corners. The determination of whether an instrument is ambiguous is a question of law for the court to decide.” Austin v. Cox, 523 So.2d 376, 379 (Ala.1988). Even if some ambiguity does exist in a contract, a court has the duty to accept a construction that will uphold *1239 the contract, rather than one that will make it invalid. See Wilson v. World Omni Leasing, Inc., 540 So.2d 713, 716 (Ala.1989).’
“Southland Quality Homes, Inc. v. Williams, 781 So.2d 949, 953 (Ala.2000).”
Booth v. Newport Television, LLC, 111 So.3d 719, 724 (Ala.Civ.App.2011).
The trial court does not explain its reasoning for concluding that “[pferagraph 14(A) ... [was not] so vague as to be unenforceable or void.” However, in its brief to this court, Lattof contends that paragraph 14(A) was enforceable because “there is absolutely nothing left for the parties to agree upon.” A careful reading of the plain language of paragraph 14(A) indicates, in pertinent part, that, upon commencement of preconstruction sales of the condominium units, GHD would provide Lattof with floor plans, site plans, and tentative pricing. Lattof was guaranteed a credit of $1,500,000 to be used against the purchase price of the condominium units of which Lattof would have the 1st, 20th, and 35th choice. The contract further established when Lattof must notify GHD of its choices and the documents that were to be executed.
Our supreme court has held that “[a] document is unambiguous only if one reasonable meaning emerges from a reading of the document. Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co., 622 So.2d 314 (Ala.1993).” Drummond Co. v. Walter Indus., Inc., 962 So.2d 753, 780 (Ala.2006). GHD is correct that “ ‘ “[a] contract that ‘ “leav[es] material portions open for future agreement is nugatory and void for indeflniteness.” ”” ” Macon Cnty. Greyhound Park, Inc. v. Knowles, 39 So.3d 100, 108 (Ala.2009) (quoting White Sands Group, L.L.C. v. PRS II, L.L.C, 998 So.2d 1042, 1051 (Ala.2008), quoting in turn Miller v. Rose, 138 N.C.App. 582, 587-88, 532 S.E.2d 228, 232 (2000), quoting in turn MCB Ltd. v. McGowan, 86 N.C.App. 607, 609, 359 S.E.2d 50, 51 (1987)). However, the intent of the parties is clear from the language of paragraph 14(A). In simplest terms, Lattof, using the $1,500,000 credit, will purchase condominium units pursuant to the same purchase agreement offered to all parties interested in purchasing a condominium unit from GHD. The language is not so ambiguous or vague that it relegates paragraph 14(A) to a mere agreement to agree, nor is there a material portion of the parties’ agreement subject to future negotiation.[3]
We do, however, disagree with the trial court’s interpretation of paragraph 14(A) insofar as it interjected a “reasonable time for performance” for GHD to begin construction on the condominium units. In its judgment, the trial court stated:
“4. There was no time for performance of [GHD’s] obligation under [pferagraph 14(A) of the [contract] and therefore[,] as a matter of law, said obligation is due to be performed within a reasonable time.
“5. A reasonable time for performance of [GHD’s] obligation under [pferagraph 14(A) of the [contract] expired on December 15, 2008, which was three (3) years after the closing of the real estate transaction between the parties.”
The contract did not specify a time for GHD to begin construction of the *1240 condominium units, nor did it state that time was of the essence. The trial court is correct that “where a contractual obligation to perform exists, and no time is prescribed in the contract for performance, the law requires the obligated party to perform within a ‘reasonable time.’ ” Lemon v. Golf Terrace Owners Ass’n, 611 So.2d 263, 265 (Ala.1992). However, the determination of a “reasonable time” is a question of fact and “‘depends upon the nature of the act to be done and all the circumstances relating to the act.’ ” Gray v. Reynolds, 553 So.2d 79, 82 (Ala.1989) (quoting Deupree v. Ruffino, 505 So.2d 1218, 1221 (Ala.1987)).
GHD argues that construction of the condominium units is a condition precedent to the fulfillment of its obligations pursuant to paragraph 14(A). Jimmy Langdon, an agent of GHD, testified by affidavit that GHD had immediately undertaken to improve the property and had expended “several million dollars.” However, according to Langdon, GHD suspended construction on the development due to the collapse of the real-estate market. Lang-don further testified that “[m]arket conditions at Orange Beach remain such that a project of this size and type is just not financially feasible.”
On the other hand, Lattof asserts that GHD’s obligations under paragraph 14(A) are due to be completed within a reasonable time and that GHD cannot escape from those obligations by preventing the construction of the condominium units. See Sims v. City of Birmingham, 256 Ala. 540, 55 So.2d 833, 837 (1952).[4] Mitchell Lattof also testified via affidavit attached to Lattofs motion for a summary judgment. According to Mitchell Lattof, agents of GHD represented to him that the development would be completed in approximately three years.
We have carefully examined the contract in its entirety. We note that paragraphs 3 and 4 describe the options that were exercised under the contract, specifically that GHD exercised its option to purchase the property and that option fees paid up to that point were to be applied to the purchase price. We further note that paragraph 5 established the purchase price of $25,000,000, less the option fees GHD had already paid. The parties also agreed, pursuant to paragraph 5, that $1,000,000 of the purchase price would be allocated to improvement of a specific area of the property. The record indicates that the purchase price was tendered to Lattof; Lattof in turn tendered the deed to the property to GHD. Absent from the detailed language of the aforementioned paragraphs is a reference to any outstanding obligation of either party or a bargained-for option that could be exercised at a later date. In fact, we do not find any language within the four corners of the contract obligating GHD to perform under paragraph 14(A) before commencing the construction of the condominium units.[5]
*1241 Viewing the evidence in a light most favorable to GHD, we conclude that a genuine issue of material fact exists regarding whether a reasonable time for performance was implied by the contract or whether the construction of the condominium units was a condition precedent to GHD’s obligations under paragraph 14(A).
III.
We next address whether the trial court incorrectly interpreted paragraph 14(A) when it awarded Lattof $1,525,000 plus 6% interest in damages. In its motion for a summary judgment, Lattof requested that the trial court award “court costs and such other relief as the [trial c]ourt deems appropriate.” Mitchell Lat-tof asserted in his affidavit that GHD “had the option to either provide [Lattof] with a credit of $1,500,000.00 towards the purchase of up to three (8) condominium units OR to provide [Lattof] a cash payment of $1,525,000.00.” (Capitalization in original.) The trial court, apparently adopting Lat-tofs interpretation of paragraph 14(A), stated in its judgment:
“6. As of the date of this Order, [GHD] has not performed under either option of [paragraph 14(A) of the [contract], and furthermore has not attempted to construct the condominium development so as to be able to perform the $1,500,000.00 credit option under said paragraph.
[[Image here]]
“8. [GHD] has been in breach of [pjaragraph 14(A) of the [contract] since December 15, 2008.”
The trial court awarded Lattof damages in the amount of $1,525,000 plus 6% interest accruing from the date the trial court determined that GHD had breached the contract, i.e., December 15, 2008.
' We are unpersuaded that paragraph 14(A) entitled Lattof to receive an award of $1,525,000 in lieu of the $1,500,000 credit toward the purchase of condominium units. In addition to describing the process by which condominium units would be conveyed from GHD to Lattof, paragraph 14(A) also provides:
“In lieu of providing all or part of this credit to Sellers, as a buy-out of all or some of Sellers’ under this paragraph 14(A), Buyer may pay to Sellers in cash at anytime prior to the execution of pre-construction purchase agreements using the entirety of the credit, the amount of the then remaining credit plus the sum of $25,000.00.”
We agree with Lattof that the above-quoted language vested GHD with the discretion to tender the money in lieu of conveying the condominium units. However, paragraph 14(A) contains no language vesting Lattof with the authority to demand the cash payment as a substitute for the condominium units. We therefore conclude that the plain language of paragraph 14(A) does not support an award of money damages to Lattof.

Conclusion

Based upon the foregoing, we hold that the trial court did not err insofar as it determined that the contract did not violate state statutes or the City’s subdivision regulations and that paragraph 14(A) was not so vague or ambiguous that it was effectively only an agreement to agree. However, we conclude that there was a genuine issue of material fact as to whether construction of the development was a condition precedent to GHD’s obligation to perform in accordance with paragraph 14(A) or, in the alternative, whether a reasonable time for such performance had elapsed. Accordingly, we reverse the *1242 summary judgment in favor of Lattof and remand this cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN, MOORE, and DONALDSON, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. The legal description of the property in the contract referred to the "northeast corner of lot 3, Terry Cove Marina Planned Unit Development.” This is a point of reference from the adjoining development and is not a lot on the property at issue in the present case.

. We recognize that "[i]t is a well-established rule of contract construction that any ambiguity in a contract must be construed against the drafter of the contract,” SouthTrust Bank v. Copeland One, L.L.C., 886 So.2d 38, 43 (Ala.2003); however, the contract in the present case incorporated the following agreement of the parties: "This [contract] shall not be construed against the drafter, as the parties acknowledge that both parties have been instrumental in the drafting hereof.”

. GHD attached the affidavit of Sam Irby, an experienced real-estate attorney practicing in Baldwin County, in which Irby testified that it was his opinion that paragraph 14(A) was too vague and ambiguous to be enforceable. Lat-tof filed a motion to strike the Irby affidavit; the record does not indicate whether the trial court addressed the motion. However, because whether a contract is ambiguous is a question of law, see Booth, supra, Irby’s "expert" opinion does not create an issue of fact.

. Lattof cites Murphy v. Schuster Springs Lumber Co., 215 Ala. 412, 111 So. 427 (1926), in support of the argument that a failing market does not excuse a party from a reasonable time for performance. Lattof’s interpretation of Murphy is overbroad. The issue in Murphy was whether an optionee had exercised an option to renew within the time specified in the contract. 215 Ala. at 414, 111 So. at 428-29. Tantamount to the Murphy court's analysis of the issue was its recognition that, "in option contracts, unless expressly negatived, time is always of the essence.” 215 Ala. at 415, 111 So. at 429. Due to its narrow focus on option contracts and the timber industry, we do not find Murphy instructive in the present case.

. Because we have concluded that the contract was not vague or ambiguous, we will consider only the terms contained within the four corners of the contract. See McIntosh v. Livaudais, 979 So.2d 92, 95 (Ala.Civ.App. *1241 2007) (quoting Strickland v. Rahaim, 549 So.2d 58, 60 (Ala. 1989)).